IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
November 6, 2018 Session

## STATE OF TENNESSEE v. WILLARD HAMPTON

**Appeal from the Criminal Court for Shelby County
No. 16-00448     W. Mark Ward, Judge**

_____

### No. W2018-00623-CCA-R3-CD

_____

The Defendant, Willard Hampton, was convicted by a jury of two counts of simple possession of marijuana, which convictions were later merged by the trial court. The Defendant appeals, arguing that (1) the trial court erred by denying the Defendant's motion to suppress the evidence seized during the traffic stop because there was insufficient proof to establish that he committed a traffic offense in Shelby County, and (2) the trial court erred by denying the Defendant's request for diversion or probation because of the Defendant's untruthfulness and lack of candor at trial. After a thorough review of the record, we affirm the judgments of the trial court. However, we remand for entry of corrected judgments to set the percentage of minimum service at seventy-five percent.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court
Affirmed; Case Remanded**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which TIMOTHY L. EASTER and J. ROSS DYER, JJ., joined.

Terrell L. Tooten, Cordova, Tennessee, for the appellant, Willard Hampton.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Walter C. ("Chris") Scruggs, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### FACTUAL BACKGROUND

The January 2016 term of the Shelby County Grand Jury returned an indictment against the Defendant, charging him with alternative counts of possession of 136,050 grams or more of marijuana with the intent to sell or deliver (Counts 1 and 2, respectively) and possession of a firearm with the intent to go armed during the commission of a dangerous felony (Count 3). See Tenn. Code Ann. §§ 39-17-417, -1324. Prior to trial, the Defendant filed a motion to suppress the drugs that were found during the warrantless traffic stop, arguing that he was detained without sufficient probable cause. The trial court denied the Defendant's suppression motion following a hearing,[1] and the Defendant proceeded to a trial by jury.

At trial, Lieutenant Brian Nemec with the Organized Crime Unit of the Memphis Police Department ("MPD") testified that, on July 9 or 10, 2015, he received an anonymous tip from a caller who informed him that a certain individual would be traveling out of town for illicit purposes. The caller also provided the individual's name, date of birth, and social security number, as well as giving a description of the tractor trailer and "a general area where that vehicle was going to be located." Lieutenant Nemec gave the caller "his phone number and started . . . a computer investigation using the [MPD's] databases to try and verify if" the individual supposedly traveling out of town "was a real person." After verifying the named individual's identity, Lieutenant Nemec was also able, based upon the caller's information, to locate the tractor trailer in a storage facility lot "off of Winchester near kind of in-between Ross and Germantown Road." Lieutenant Nemec described the tractor trailer, which was a refrigeration unit, as follows: "[I]t was a freight liner that . . . was white and it had blue stripes coming down the tractor and it had a trailer attached to it. And located on the tractor and the trailer had M [&] S Transportation on it." According to Lieutenant Nemec, the tractor trailer matched the description provided by the caller.

Lieutenant Nemec spoke with the caller several times. Although Lieutenant Nemec was provided with an approximate time and date that the truck was supposed to leave the facility, the truck was gone earlier than anticipated, and they missed it leaving the lot. The caller relayed to Lieutenant Nemec when the truck would be returning to the area. So, Lieutenant Nemec set up a "drug interdiction plan for when the truck was coming back towards Memphis[,]" which included "an interdiction vehicle" on the interstate monitoring vehicles, a canine unit, additional surveillance teams, and office staff.

Sergeant Brandon Harris, also with the Organized Crime Unit of the MPD, testified that, on July 12, 2015, he was a part of Lieutenant Nemec's drug interdiction team. Sergeant Harris "was told to be on the lookout for a particular vehicle, an 18 wheeler, that was supposed to be traveling from Texas to the Memphis area" and possibly

---

[1] A different judge, James C. Beasley, Jr., conducted the suppression hearing.

"contain[ed] large amounts of marijuana." Sergeant Harris was shown pictures of the truck and given an approximate time of the truck's return. Thereafter, Sergeant Harris positioned his police vehicle on I-55 south of "the old bridge" "where [they] thought the vehicle might first come" into the Memphis area. He was accompanied in the vehicle by his partner Detective Galvin Takashima and Detective Takashima's drug dog. Detective Takashima explained that they were situated "on the east side of the Memphis Arkansas bridge."

After Sergeant Harris spotted the suspect vehicle, he "pulled out and got behind" the truck. According to Sergeant Harris, while they were following the truck, it veered from the "lane of travel and the whole right side of [the truck] . . . crossed the solid white line and ran on[to] the warning strips[.]" Sergeant Harris said that the truck was running off the road for approximately "a quarter mile" before it exited at McLemore Street, the first exit off of I-55. Once the truck exited the interstate, Sergeant Harris conducted a traffic stop by initiating his blue lights. Sergeant Harris estimated that he had traveled approximately one and a-half to two miles from the bridge inside Shelby County before stopping the truck.

Sergeant Harris approached the truck and learned that the Defendant was the driver of the truck and that there was a female passenger. After informing the Defendant of the reason for the stop, Sergeant Harris asked the Defendant to step out of the truck because of the noise and "come to the rear so [they] could talk and understand each other." In addition to obtaining the Defendant's driver's license, Sergeant Harris asked the Defendant for his "log book" and manifest[2] detailing the Defendant's stops and list of contents, both of which were required of "commercial 18-wheeler drivers" according to Sergeant Harris. The Defendant told Sergeant Harris that he was coming from Weatherford, Texas; however, the Defendant's log book indicated that he "picked up [his] load" in El Paso, Texas, which was roughly eight hours away from Weatherford according to Sergeant Harris. Sergeant Harris testified that the log book reflected that the Defendant stopped in El Paso for twenty hours. The Defendant also informed Sergeant Harris that he initially started his trip by taking a "load of pallets" to Oklahoma on his way to Texas; however, this was "irregular" in Sergeant Harris's opinion because it was not cost efficient.

---

[2] We feel constrained to observe that the terms manifest and bill of lading were often used interchangeably during these proceedings. Wikipedia notes that "[a] cargo manifest and a bill of lading may carry similar information and the concepts are not always clearly distinguished." Manifest (transportation), Wikipedia, https://en.wikipedia.org/wiki/Manifest_(transportation) (last visited Feb. 15, 2019). It explains, "In some cases, a single document may serve both purposes. In general, a bill of lading serves as a legal instrument focusing on and documenting such issues as ownership, whereas a cargo manifest is often more concerned with physical aspects of the cargo, such as weight and size." Id.

Moreover, the Defendant did not have a manifest. The Defendant told Sergeant Harris that he was hauling "return parts and [that] the weight of his entire load was 1100 pounds[,]" but according to Sergeant Harris, a passenger car could carry that amount of weight and a tractor trailer was not required. Sergeant Harris further relayed that, despite the fact that there was a seal placed on the lock to the doors of the trailer, the doors were unlocked and the seal was "suspicious[ly]" just hanging there. Sergeant Harris described the Defendant as "nervous" during this conversation and said that the Defendant's "speech inflections [went] up and down."

While Sergeant Harris waited on dispatch to process the Defendant's information, Sergeant Harris requested the Defendant's consent to search the truck. The Defendant agreed to a search and signed a consent form. "[R]ight around the same time," Detective Takashima was running his drug dog "Snow" around the truck, and "Snow alerted to the front driver's side in between the trailer and the back of the truck." Sergeant Harris explained the location of the alert, providing that, because the truck was a refrigeration unit, it had "two drain plugs in the front of the trailer" and "two holes underneath it to let the condensation out," so the "truck [was] not air tight[.]" With the signed consent to search and indication of the narcotic odor from the dog, Sergeant Harris began to search the truck by opening the trailer's doors. Sergeant Harris observed seven large cardboard boxes wrapped in "green cellophane" inside the truck. Snow smelled one of the cardboard boxes that had been removed from the truck and "immediately gave a positive alert for the presence of narcotics."

When Lieutenant Nemec arrived on the scene of the traffic stop, the back of the truck was already opened. After cutting through the cellophane wrapped around the box, Lieutenant Nemec and the other officers found "[i]ndividual clear[,] sealed baggies" of marijuana that had been "vacuum sealed." There were 329 vacuum-sealed bags in total from the seven boxes, and each bag weighed approximately one pound. The marijuana, once the packaging was removed from the various bags, collectively weighed 324.49 pounds.

The Defendant and his female passenger were arrested. Also found inside the cab of the truck were a firearm and a small bag of cash. According to MPD Detective Marco Reed, the firearm was loaded at the time it was discovered.

The labels on each bag of marijuana reflected the location of the traffic stop as "I-55 and McLemore." Lieutenant Nemec confirmed that this address was in Shelby County, Tennessee. In addition, Sergeant Harris testified that, in his training and experience, a pound of marijuana could sell for anywhere between $500 to $7,000 in the Memphis area. Utilizing the low end number of $500 a pound, Sergeant Harris estimated that the Defendant's load of marijuana was worth "[o]ver $160,000, $170,000 or so."

Tennessee Highway Patrol Trooper Owen Grear testified that he was "trained and certified in commercial vehicle enforcement[.]" When Trooper Grear was asked what type of documents a tractor-trailer driver should be in possession when pulled over, Trooper Grear replied, "[A] Class A driver's license, [a] log book if they're in the right mile radius, [a] bill of lad[ing] for their load, [and a] placard if it's a hazardous load." Trooper Grear explained that a bill of lading and manifest were important "to show what's in the trailer to show where the load [was] coming from, where the load [was] going to." Trooper Grear continued, "It [does not] have to be an exact description of the load but a brief description of the load. It's supposed to have a weight of the load, estimated value, insurance information to cover the load, so things like that." According to Trooper Grear, unless the truck was empty, there should be "paperwork showing what's in the trailer." Trooper Grear maintained that these requirements benefitted the public in the event of a "hazard issue" and reduced the risk of theft. Additionally, according to Trooper Grear, the only exception to these paperwork requirements applied to farmers hauling grain from the field.

Trooper Grear also explained the purpose of having a seal on the trailer's doors: "Driver accountability and so they can show, make sure the seal when the load leaves the dock, that the trailer is sealed, has not been tampered with before it gets to the receiver." Moreover, each seal had a number to identify the specific load and that number would also appear on the bill of lading. According to Trooper Grear, the seal removed from the Defendant's truck was new and had never been used.

The female passenger, Latoya Hardrick, also testified during the State's case-in-chief. Ms. Hardrick said that she rode with her friend the Defendant to El Paso, Texas, in July 2015. According to Ms. Hardrick, they stopped overnight somewhere in Oklahoma on the way to El Paso, but she could not remember if they dropped anything off while in Oklahoma. Ms. Hardrick said that, once in El Paso, they went to a Mattress Firm warehouse but that she never exited the truck while they were there. According to Ms. Hardrick, after leaving El Paso, they did not stop on the way back to Memphis except to get gas and to go through border patrol where the truck was searched.

Ms. Hardrick recalled that, once they got "all the way to Memphis," they passed a police car that was sitting near "Martin Luther Park." Ms. Hardrick described the details of the traffic stop, occurring "at the end of Mallory," that followed. Ms. Hardrick averred that the officer "said something about [the Defendant's] r[unning] a stop sign or a light, something like that," but she claimed that the Defendant did not "because [there was] no light coming that way." Ms. Hardrick was also asked to exit the truck, and she complied and spoke with the officers. In addition, Ms. Hardrick testified that the officers took "some papers" from the Defendant regarding the details of the trip but that the officers said the papers were "not valid[.]" Furthermore, according to Ms. Hardrick, the officers

-5-

"opened the back of the truck," despite the fact that they were "not supposed to because [there] was a seal on the truck." She was adamant that the truck was sealed and that the seal was broken by the police.

Ms. Hardrick further described that, after the police dog sniffed the boxes, the "dog ran back and got in the police truck," but the dog "didn't bark or nothing [sic]." She claimed that one of the officers then said that "something look[ed] suspicious to [him,]" so "he opened the boxes" anyway. Ms. Hardrick maintained that she did not know what was inside the boxes at that time.

The State rested, and the Defendant called Fred Askew to the stand. Mr. Askew testified that the Defendant was employed with his company during the relevant time frame. Mr. Askew owned the truck that the Defendant was driving, which was sometimes parked in a storage lot "off Winchester and Ross Road[.]" According to Mr. Askew, the Defendant was supposed to be picking up "a produce load" of cabbage in Texas, which was why a refrigeration unit was needed. When the load was canceled, there were "some mixed products coming back to the shipper anyway," so the Defendant "just picked that up." Mr. Askew could not recall when or if a mattress company was involved.

According to Mr. Askew, the electronic system used by his company, which he referred to as a "load board," would show the location of pick-up and delivery for the load, "the weight, piece count, and how much the load [would] pay." Mr. Askew explained that the "load board" would generate a bill of lading that would include "an inventory of the vehicle or at least a general description of what" was being carried and how much it weighed. According to Mr. Askew, there should have been a bill of lading for the Defendant's load and a seal on the Defendant's truck. However, Mr. Askew did not have a bill of lading for the Defendant's July 2015 trip to Texas, and he could not recall where the Defendant was supposed to deliver this particular load in Memphis. Mr. Askew further explained that, if a bill of lading was sent by email, a driver should be able to use their phone to retrieve it. Mr. Askew agreed that the Defendant should have received a bill of lading for the load and that, without such a document, the truck should have been empty.

The Defendant testified that he left Memphis with a load of pallets, which he delivered to a company in Oklahoma City. The Defendant asserted that it was not "uncommon" to "get load of just pallets[.]" According to the Defendant, the original cabbage load he was scheduled to receive in El Paso was canceled, and in its place, he went to pick up "return parts" from a mattress company "in the same vicinity[.]" When he arrived at the mattress place, the company's workers loaded and sealed the truck, and he did not get out. The Defendant asserted that the company provided him with "the name[ and] address of the receiver and everything." The Defendant recalled that he was

to deliver the load from the mattress company to a trucking company called "HB Phillips." The Defendant maintained that, sometimes with "partial loads," the shipper would email the bill of lading to the receiver. The Defendant claimed that he had the required bill of lading information and a blank form, but that he had just not filled out the form at the time of the traffic stop, although he had written down the information in his log book.

In addition, the Defendant claimed that he stopped at several weigh stations on his return trip to Memphis and that he went through border patrol, which included a search by drug-sniffing dogs and a scan of the truck. According to the Defendant, he had not tampered with the seal on his truck, and no one had mentioned any problems with the seal during his various stops.

Regarding the traffic stop, the Defendant testified that the officer told him that he had "straddle[d] the line" and that he was going to perform "a quick inspection of the truck." However, the Defendant claimed that he did not straddle any line because "from the interstate to McLemore you can throw a rock and hit[.]" The Defendant averred that he cooperated with the police during the traffic stop, including providing his consent to search the truck and giving the officer his log book. The Defendant explained that he told the officer that he was coming from Weatherford, Texas, because that was the halfway-point between El Paso and Memphis and that he had taken a ten-hour break there. The Defendant expressed that, while he was "familiar" with the load board described by Mr. Askew, he did not pick the load to be hauled, but he "just receive[d] the loads and pick[ed] them up."

The Defendant denied any knowledge of the marijuana inside his truck, and he asserted that the gun was unloaded when it was found inside the truck and that the bullets were stored separately. He claimed that he carried the gun for protection. The Defendant also acknowledged that he had a bag of cash in the truck and that Mr. Askew had given him "the money for fuel and maintenance of truck." The Defendant estimated that the bag contained approximately $2,800.

The Defendant confirmed that Ms. Hardrick, whom he had known between ten and twelve years, rode with him on the trip in question. However, the Defendant averred that she was "unstable" due to a car accident that required "a steel plate" be placed "in her head."

After the conclusion of the proof, the jury found the Defendant guilty of the lesser-included offense of simple possession of marijuana on both possession charges and acquitted him of the firearm offense. The trial court sentenced the Defendant to eleven months and twenty-nine days at seventy-five percent on each of the possession convictions, which the trial court merged. The Defendant appealed.

ANALYSIS

On appeal, the Defendant argues that (1) the trial court erred by denying the Defendant's motion to suppress the evidence seized during the traffic stop because there was insufficient proof to establish that he committed a traffic offense in Shelby County, and (2) the trial court erred by denying the Defendant's request for diversion or probation because of the Defendant's untruthfulness and lack of candor at trial. We will address each in turn.

## I. *Motion to Suppress*

The Defendant contends that the trial court erred in denying his motion to suppress because the State failed to prove venue or territorial jurisdiction, specifically that the State failed to present "sufficient evidence to support that a traffic infraction actually occurred in Shelby County, Tennessee, if at all." The Defendant notes that "the testimony of Sergeant Brandon Harris and Officer Galvin Takashima [at the motion to suppress hearing] regarding what traffic infraction occurred, and where, is confusing at best[,]" and asserts that "[t]he statements of the two officers appear to be inconsistent." According to the Defendant,

> [n]aming locations and street names, without stating whether the locations are in Shelby County, is a fatal error to the State's case, and the evidence should be suppressed due to the fact that the State has failed to establish that it had jurisdiction to initiate the traffic stop, and therefore has failed to prove that the traffic stop was legal.

However, the State correctly surmises that the Defendant is confusing two different legal concepts—the State's burden to prove jurisdiction and venue at trial and the State's burden to establish that the Defendant's traffic stop was supported by either reasonable suspicion or probable cause.

## A. *Venue and Territorial Jurisdiction*

"It is elementary that before a court may exercise judicial power to hear and determine a criminal prosecution, that court must possess three types of jurisdiction: jurisdiction over the defendant, jurisdiction over the alleged crime, and territorial jurisdiction." State v. Legg, 9 S.W.3d 111, 114 (Tenn. 1999). "[T]erritorial jurisdiction, which recognizes the power of a state to punish criminal conduct occurring within its borders, is embodied in the constitutional right to a trial 'by an impartial jury of the county in which the crime shall have been committed.'" Id. (citing Tenn. Const. art. I, § 9; U.S. Const. amend. VI). Territorial jurisdiction, i.e., that the offenses charged occurred in the State of Tennessee, is a more fundamental concern than venue and

-8-

recognizes that a "state's criminal law is of no force and effect beyond its territorial limits." Legg, 9 S.W.3d at 114-16 (quoting Coffee v. Peterbilt of Nashville, Inc., 795 S.W.2d 656, 658-59 (Tenn. 1990)). Territorial jurisdiction must be proven beyond a reasonable doubt. See State v. Beall, 729 S.W.2d 270, 271 (Tenn. Crim. App. 1986). Furthermore, in Beall, this court held that the question of whether a murder was committed in this state or another state is "a factual matter to be resolved by the jury after hearing all the testimony of the witnesses, weighing their credibility, and applying to the facts the law as given them by the trial judge." Id.

Turning to venue in a particular county, criminal offenses committed within the State of Tennessee, in general, are prosecuted "in the county where the offense was committed." Tenn. R. Crim. P. 18(a). "Proof of venue is necessary to establish the jurisdiction of the court, but it is not an element of any offense and need only be proved by a preponderance of the evidence." State v. Hutcherson, 790 S.W.2d 532, 535 (Tenn. 1990); see State v. Young, 196 S.W.3d 85, 101 (Tenn. 2006) (holding that "[p]roof of venue is necessary to establish the jurisdiction of the court, but it is not an element of any offense"); see also Tenn. Code Ann. § 39-11-201(e) ("No person may be convicted of an offense unless venue is proven by a preponderance of the evidence."). Moreover, "[v]enue is a question for the jury" and can be established by circumstantial evidence. Young, 196 S.W.3d at 101-02 (citations omitted). To determine venue, the jury is permitted to draw reasonable inferences based upon the evidence presented. Id. at 102 (citing State v. Johnson, 673 S.W.2d 877, 882 (Tenn. Crim. App. 1984)).

Regarding venue and territorial jurisdiction over the *charged offense*, the relevant issue was whether the marijuana was possessed within Shelby County regardless of where the traffic offense occurred. The Defendant does not dispute that the traffic stop itself occurred in Memphis where the marijuana was discovered inside the truck. Moreover, various witnesses testified that the Defendant was driving the truck, which was stopped in Shelby County, and the Defendant, therefore, was in possession of the marijuana found inside the truck during the stop. Accordingly, both venue and jurisdiction were adequately established at trial.

B. *Reasonable Suspicion and Probable Cause*

Turning to the other legal concept raised by the Defendant—whether the State carried its burden at the motion to suppress hearing of showing that the traffic stop was justified by reasonable suspicion or probable cause that a criminal offense had been or was about to be committed within Shelby County. In the suppression motion filed before trial, the Defendant submitted, among other things, that "the officers stop of [the Defendant] for straddling lanes was pretextual and without sufficient probable cause."

-9-

At this juncture, we will provide the pertinent testimony from the suppression hearing relevant to the issue. Sergeant Harris testified at the motion to suppress hearing that he "was sitting at I-55, the old bridge as they call it[,] on the Memphis, Tennessee side when [he] observed a truck that matched the description [he] was to be on the lookout for come across the bridge." He got behind the truck and followed it, "[a]nd as the [truck] went southbound on 55 from Crump, the [truck] swerved from its lane into the right shoulder hitting . . . [the] rumble strips [or] the warning strips." Sergeant Harris explained that rumble strips are "designed to alert a driver that they are running off the road and no longer in the roadway." According to Sergeant Harris, the driver of the truck strayed from the marked roadway "for several hundred yards" before "exit[ing] off 55 on to McLemore." Once on McLemore, Sergeant Harris initiated the traffic stop due to driver's "running off the roadway and running outside of his lanes."

Sergeant Harris testified that he went to the cab of the truck and spoke with the driver. He was able to identify the Defendant from his Texas driver's license. Sergeant Harris requested that the Defendant exit the truck due to the truck's loud engine noise making it difficult to converse. The Defendant complied, and they were able to talk and hear each other once at the back of the trailer. Sergeant Harris testified that the Defendant appeared "very nervous" and was "[v]isibly shaking." Sergeant Harris asked for the Defendant's "logbooks and paperwork from [the Defendant's] load[,] and [the Defendant] agreed." According to Sergeant Harris, approximately five minutes elapsed between his initial face-to-face contact with the Defendant and the dog's alerting on the truck. Sergeant Harris confirmed that the dog's alert occurred before dispatch responded to his request for a check on the Defendant's information.

On cross-examination, Sergeant Harris stated that he was "initially" investigating "[the Defendant] for running off the road." Sergeant Harris claimed that all nine of the passenger-side tires of the truck were "on the rumble strips." The traffic stop occurred at 10:50 p.m. according to Sergeant Harris. Sergeant Harris explained that it was "always" a safety concern that truck drivers might be getting tired. However, Sergeant Harris acknowledged that he was also suspicious of drug trafficking and that the stop was "pretextual." Sergeant Harris acquiesced that the Defendant was not "free to leave" until the "traffic stop was concluded."

Upon questioning by the trial court, Sergeant Harris said that, in addition to a driver's license, he routinely asked truck drivers for their logbooks and paperwork. Sergeant Harris testified that his "specialized training" in this area helped him determine if someone was "being deceitful." Also, Sergeant Harris relayed that, when a truck was stopped at a weigh station, it was subject to a random search, and if the truck driver's paperwork was not in order, they could "put [the driver] out of service" until the violation was fixed.

-10-

When asked why he pulled the Defendant over, Sergeant Harris replied that it was for "[s]traddling the lanes." Sergeant Harris confirmed that there was "a traffic violation for that[.]" When asked how far he followed the Defendant, Sergeant Harris relayed:

> Right when you come over the old bridge. If you're familiar with the old bridge. There's a (indiscernible) right there. And I was in . . . by the Metal Museum. I was in the grass right there right as he comes over the bridge. So by the time I pulled out, got in traffic and caught up to him, he was almost at McLemore. . . . I can't envision how . . . far it is from Crump to McLemore. It's not far. But when I got behind him he runs off the road. I'm assuming he's looking at me in the rearview mirror. He said road conditions is what caused him to run off the road which I never witnessed any road conditions. But he ran off the road. Pulled off at McLemore and that's when I pulled him over.

Detective Takashima also testified at the suppression hearing and explained the details of the stop. According to Detective Takashima, they "were set up stationary[,] [s]itting up on the bridge at Arkansas/Tennessee bridge." After seeing the suspect vehicle, they "pulled up behind it," "followed the truck[,] and came off Crump southbound 55." When asked about his observations, Detective Takashima said that the truck "swerved a few times" "on the shoulder line[,]" "[s]traddl[ing] the line." Detective Takashima maintained that the truck veered off the roadway and that he did not "see any reason [or] obstructions in front of the truck that would have caused it to travel" from the road. Detective Takashima confirmed that, once the truck was stopped, he asked the female passenger to exit and spoke with her.

At the conclusion of the suppression hearing, defense counsel argued that, "[b]ased on the positioning as to where [Sergeant Harris] said he was parked, there would simply have been no time for [him] to see [the Defendant] actually straddle any lanes." Defense counsel further averred that neither of the officers testified that "the straddling occurred in Tennessee[,]" and noted that this was significant "especially if they [were] right at that bridge coming over into Tennessee." The trial court found this argument to be without merit, concluding in part as follows:

> [T]he testimony was that after [the Defendant] crossed the bridge entering into Shelby County, the officer was sitting there at the Metal Museum and he observed the tractor trailer coming off of I-55 heading down I-55, passed the Crump exchange and to McLemore and get off on McLemore. So circumstantially I'm satisfied that they proved venue. And based on the testimony, it appears that the officer did observe a traffic violation, straddling lanes. . . . In this court's opinion[,] there was a valid traffic stop for straddling lanes. And then at that point you get into a whole other

-11-

sector when [the Defendant] was removed from the truck according to all of the testimony, it's apparently quite noisy at the cab of a truck or a tractor . . . , and they asked him to step to the rear which he did. And there was no undue delay in doing that. Asked for his driver's license.

The trial court further determined that, the confirmatory details from the anonymous tip, coupled with "all of the suspicious things that [Sergeant Harris] [was] observing and the answers that he [was] getting from [the Defendant]," gave him "probable cause to have some concern about what was going on under these circumstances and to inquire further of [the Defendant]."

On appellate review of suppression issues, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence." State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions about "the assessment of witness credibility, the weight and value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court" as the trier of fact. State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008) (citing State v. Scarborough, 201 S.W.3d 607, 615 (Tenn. 2006)). When the trial court "makes findings of fact in the course of ruling upon a motion to suppress, those findings are binding on appeal unless the evidence in the record preponderates against them." Id. (citing State v. Berrios, 235 S.W.3d 99, 104 (Tenn. 2007)). Conversely, a trial court's conclusions of law along with its application of the law to the facts are reviewed de novo without any presumption of correctness. Id. (citing State v. Hayes, 188 S.W.3d 505, 510 (Tenn. 2006)). In reviewing a trial court's ruling on a motion to suppress, an appellate court may consider the evidence presented both at the suppression hearing and at the subsequent trial. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution guarantee the right to be free from unreasonable searches and seizures. A vehicle stop and detention of the vehicle's occupants constitutes a seizure under both constitutions. Whren v. United States, 517 U.S. 806, 809-10 (1996); State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000). In the context of a traffic stop, a person is seized when the officer activates the cruiser's blue lights. Binette, 33 S.W.3d at 218. Generally, "under both the federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." State v. Yeargan, 958 S.W.2d 626, 630 (Tenn. 1997). The State has the burden to demonstrate, by a preponderance of the evidence, that a warrantless search passes constitutional muster. State v. Harris, 280 S.W.3d 832, 839 (Tenn. Crim. App. 2008).

A warrant is not required for an investigatory stop "when the officer has a reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed." State v. Bridges, 963 S.W.2d 487, 492 (Tenn. 1997); see also Terry v. Ohio, 392 U.S. 1, 21 (1968); Binette, 33 S.W.3d at 218; Yeargan, 958 S.W.2d at 630. Reasonable suspicion is a lower standard of proof than probable cause, but it must be more than the officer's "inchoate and unparticularized suspicion or hunch.'" State v. Hanning, 296 S.W.3d 44, 49 (Tenn. 2009) (quoting State v. Day, 263 S.W.3d 891, 902 (Tenn. 2008)). Our supreme court has explained that reasonable suspicion is "a particularized and objective basis for suspecting the subject of a stop of criminal activity." Binette, 33 S.W.3d at 218. Reasonable suspicion exists when "specific and articulable facts . . . taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, 392 U.S. at 21.

Sergeant Harris testified that he stopped the Defendant based upon the Defendant's failure to maintain his lane. As applicable here, Tennessee Code Annotated section 55-8-123(1) provides,

> Whenever any roadway has been divided into two (2) or more clearly marked lanes for traffic, . . . [a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from that lane until the driver has first ascertained that the movement can be made with safety[.]

A violation of this section is a Class C misdemeanor. Tenn. Code Ann. § 55-8-103.

Recently, in State v. Smith, our Supreme Court analyzed and discussed case law and statutes from other states criminalizing the failure to maintain one's lane. 484 S.W.3d 393, 403-408 (Tenn. 2016). The Smith court concluded,

> Therefore, based on the plain language of the statute, and guided by our concern for public safety, we hold that Section 123(1) is violated when a motorist strays outside of [his or] her lane of travel when either (1) it is practicable for [him or] her to remain in her lane of travel or (2) [he or] she fails to first ascertain that the maneuver can be made with safety. See Tenn. Code Ann. § 55-8-123(1). Thus, even minor lane excursions may establish a violation of Section 123(1) whether or not the excursion creates a specific, observed danger.

Smith, 44 S.W.3d at 408 (footnotes omitted). The court further cautioned,

> [I]n many cases it will not be possible for an observing officer to discern either the reason for a driver's leaving her lane of travel or whether she first

-13-

ascertained the safety of the maneuver. In those cases, the officer would have to investigate further in order to determine whether the driving maneuver violated Section 123(1). See [People v.] Hackett, 971 N.E.2d [1058,] 1066 [(Ill. 2012)] (holding that an investigatory stop made after officer observed motorist deviating from lane for no apparent reason "allows the officer to inquire further into the reason for the lane deviation, either by inquiry of the driver or verification of the condition of the roadway where the deviation occurred"). In such cases, the officer would not have probable cause to stop the motorist but might have sufficient reasonable suspicion to do so. See id. (holding that officer was justified in making an investigatory traffic stop after observing motorist twice deviate from his own lane of travel to an adjacent lane of travel for no obvious reason).

Smith, 484 S.W.3d at 410.

Using Smith as a guide and considering the totality of the circumstances, we conclude that Sergeant Harris had a reasonable suspicion, supported by specific and articulable facts, that the Defendant had violated Tennessee Code Annotated section 55-8-123(1). Sergeant Harris's testimony was supported by Detective Takashima's testimony. While the Defendant claims that the statements of the two officers at the suppression hearing "appear to be inconsistent[,]" we observe no such inconsistency. Both officers testified that they saw the Defendant straddle the fog line and veer off the roadway without any observable justification. Sergeant Harris claimed that all nine of the passenger-side tires on the truck were "on the rumble strips." According to Sergeant Harris, this behavior occurred for several hundred yards. The Defendant was driving on I-55. Moreover, the Defendant was driving at dark just before 10:50 p.m., and Sergeant Harris said that fatigue was always an issue with truck drivers. Thus, Sergeant Harris was justified in stopping Defendant to investigate the reason for his lane departure. See, e.g., State v. Wellington Thomas, No E2017-01859-CCA-R3-CD, 2018 WL 3769411, at *5 (Tenn. Crim. App. Aug. 8, 2018); State v. Bradley Darrin Williams, No. M2015-00946-CCA-R3-CD, 2016 WL 4064732, at *6 (Tenn. Crim. App. July 26, 2016) (both cases holding that a police officer had reasonable suspicion of a violation of Tennessee Code Annotated section 55-8-123(1) under circumstances similar to this case).

Regarding the location of the criminalized behavior, the Defendant complains that neither officer explicitly testified that the traffic offense occurred in Shelby County but only referred to locations and street names. However, Sergeant Harris specifically stated at the suppression hearing that he "was sitting at I-55, the old bridge as they call it[,] on the Memphis, Tennessee side when [he] observed a truck that matched the description [he] was to be on the lookout for come across the bridge." According to Detective

-14-

Takashima, they "were set up stationary[,] [s]itting up on the bridge at Arkansas/Tennessee bridge." Both officers, who were members of the MPD, testified that, after seeing the suspect truck cross the bridge, they pulled up behind it and followed it and that, as the truck went southbound on I-55 from the Crump exchange, it committed the traffic infraction. Also, according to both officers, the Defendant thereafter exited the interstate at the McLemore Street exit. In our view, this was more than sufficient evidence to establish that the traffic offense took place in Shelby County. See, e.g., State v. Martinos Derring, No. W2017-02290-CCA-R3-CD, 2019 WL 244471, at *3-4 (Tenn. Crim. App. Jan. 16, 2019) (holding that the evidence was sufficient to establish venue under comparable facts).

Moreover, the testimony at trial supports this conclusion. At trial, Sergeant Harris specifically testified that Defendant's failure to maintain his lane occurred before the McLemore Street exit, and Sergeant Harris estimated that they had traveled approximately one and a-half to two miles from the bridge inside Shelby County before stopping the truck. Accordingly, the record does not preponderate against the trial court's determination that the Defendant committed the traffic violation within Shelby County.

## II. *Judicial Diversion and Alternative Sentencing*

Next, the Defendant argues that the trial court abused its discretion by not sentencing him to diversion or probation. The State responds that the trial court did not abuse its discretion in denying probation. Regarding diversion, the States admits that the trial court failed to consider the relevant factors for considering a diversion request, but the State asks this court to employ de novo review and deny the Defendant diversion.

At the sentencing hearing, a certificate of eligibility for judicial diversion was entered as an exhibit. The presentence report was also admitted. The report reflected that the Defendant was fifty-two years old, was divorced, had two adult children, had graduated from high school, and had no prior criminal record. The Defendant provided that had been employed for twenty-seven years as an independent contractor driving a truck for UPS Freight, making between $1,200 and $1,500 weekly. He additionally asserted that he had never used non-prescribed or illegal drugs. The risks and needs assessment determined that the Defendant's likelihood of re-offending was low.

The Defendant testified that, at the time of the sentencing hearing, he was the "owner/operator" for Capital Logistics. He claimed that, if given the opportunity for diversion, he would keep his appointments and submit to random drug screening. The Defendant also asserted that he would be "willing to abide by any terms that the [c]ourt would set out for" him. In addition, the Defendant stated that he had lived in the

Memphis area his entire life and that he was close with his two adult daughters, who also lived nearby.

Defense counsel requested that the Defendant be granted judicial diversion. The State argued that diversion would depreciate the seriousness of the offense because the Defendant "committed a greater crime" than simple possession, the crime for which the Defendant was convicted. The State asked the trial court to deny diversion. Defense counsel responded that, given the Defendant's age and his lack of a criminal record, the trial court should grant diversion. The trial court then noted that, had the Defendant been convicted of a Class A felony, he would not have even been eligible for diversion or probation.

Thereafter, the trial court outlined the various statutory considerations for misdemeanor sentencing and alternative sentencing, including the purposes and principles of sentencing. The trial court discussed the Defendant's candidacy for an alternative sentence in general without any specific reference to diversion. Ultimately, the trial court concluded that the Defendant was not a suitable candidate for an alternative sentence under the considerations outlined in Tennessee Code Annotated section 40-35-103. After the trial court's ruling, defense counsel did not object or ask to submit any further proof.

According to the Defendant, "the trial court abused its discretion by failing to properly consider diversion, and by failing to conduct a fair hearing which would have allowed [the] Defendant an opportunity for probation, if diversion was not granted." Regarding the denial diversion, the Defendant submits that, because "[a]ll the proof was already presented at the sentencing hearing" when the trial court determined that the Defendant had perjured himself, he was unable "to defend against" the trial court's findings, "whether through impeachment evidence, rebuttal proof, or cross-examination, in order to show that the [findings] were incorrect." The Defendant further asserts that "the analysis provided by the trial court was not the proper analysis to be used when considering diversion." In addition, the Defendant notes that the trial court "seemed to suggest that [the] Defendant would not be treated the same as other defendants[] due to the fact that the allegations and convictions against him involved drugs."

As for the denial of probation, the Defendant submits that the trial court denied his request for probation relying on the facts that the Defendant was untruthful with the court and that he was "a drug dealer." According to the Defendant, he testified at the sentencing hearing "without any significant challenges to his credibility from either the trial court or the State, regarding his suitability for probation[,]" and "[i]t was only during the State's argument, and the trial court's ruling, when [the] Defendant's suitability appeared to be attacked, during a time where no more proof was to be presented." The Defendant concludes that through his testimony, the pre-sentence report, and the TBI

report, he "had sufficiently established that he [was] suitable for diversion, but at a minimum, probation."

## A. *Procedural Complaint*

First, we will address the Defendant's procedural complaint that he was unaware that the trial court was going to find that he had perjured himself and that he was not allowed to counter that finding with additional proof. Initially, we note that the Defendant never requested any opportunity to respond or to make any such offer of proof below. See Tenn. R. App. P. 36(a) (stating that relief is not required if the party seeking it "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of the error"). Because no objection was raised after the trial court's sentencing findings, we have no way of knowing what further countervailing proof the Defendant would have offered, and he has made no indication in his appellate brief of what other additional proof he would have offered had he been so permitted. Accordingly, this issue is waived.

We further note that the trial court is advised to consider evidence presented at trial in imposing a sentence. See Tenn. Code Ann. § 40-35-210(b)(1). We also observe that a defendant's credibility and willingness to accept responsibility for the offenses are properly considered in determining his potential for rehabilitation and are relevant in determining the appropriate sentence. See State v. David Earl Nixon, No. M2005-01887-CCA-R3-CD, 2006 WL 2738132, at *5 (Tenn. Crim. App. Sept. 26, 2006). Accordingly, a Defendant's penchant for truthfulness, or lack thereof, gathered from evidence presented at trial or at sentencing, is certainly a relevant consideration in fashioning the Defendant's sentence. The use of these established legal tenants at sentencing should not have been surprising to the Defendant. We conclude that the Defendant was provided with a reasonable opportunity to be heard as to the length and manner of his misdemeanor sentence. See Tenn. Code Ann. § 40-35-302(a).

## B. *Alternative Sentencing (Probation)*

Next, we will address the Defendant's argument that the trial court erred by denying him probation. We review the length and manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). To date, the Tennessee Supreme Court has not addressed whether the abuse of discretion standard with a presumption of reasonableness applies to misdemeanor sentencing. Notwithstanding, the reasoning espoused in State v. King, that Bise applies to "all sentencing decisions," suggests that it is the appropriate standard of review to apply to misdemeanor sentencing cases as well. See King, 432 S.W.3d 316, 324 (Tenn. 2014) (citing State v. Pollard, 432 S.W.3d 851, 864 (Tenn. 2013)). Moreover, this court has

previously applied the Bise standard of review to misdemeanor sentencing cases. See State v. Bobby E. Lee, No. M2016-02084-CCA-R3-CD, 2017 WL 1806825, at *2 (Tenn. Crim. App. May 5, 2017); State v. Clifford Eric Marsh, No. M2015-00803-CCA-R3-CD, 2016 WL 349928, at *3 (Tenn. Crim. App. Jan. 28, 2016); State v. Christopher Dewayne Henson, No. M2013-01285-CCA-R3-CD, 2015 WL 3473468, at *5 (Tenn. Crim. App. June 2, 2015); State v. Sue Ann Christopher, No. E2012-01090-CCA-R3-CD, 2013 WL 1088341, at *7 (Tenn. Crim. App. Mar. 14, 2013). Therefore, we will do the same in this case.

Before a trial court imposes a sentence upon a defendant, it must consider: (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b). Moreover, appellate courts may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2007). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

Here, the Defendant was convicted of a Class A misdemeanor, which carries a maximum sentence of eleven months and twenty-nine days. See Tenn. Code Ann. § 40-35-111(e)(1). Sentences for misdemeanor offenses must be specific and in accordance with the principles, purposes, and goals of the Criminal Sentencing Reform Act of 1989. Tenn. Code Ann. §§ 40-35-104, -302(b); State v. Cooper, 336 S.W.3d 522, 524 (Tenn. 2011); State v. Palmer, 902 S.W.2d 391, 394 (Tenn. 1995). The sentencing court is granted considerable latitude in misdemeanor sentencing. State v. Johnson, 15 S.W.3d 515, 518 (Tenn. Crim. App. 1999) (citing State v. Troutman, 979 S.W.2d 271, 273 (Tenn. 1998)).

"[A] misdemeanor offender must be sentenced to an authorized determinant sentence[,]" and "a percentage of that sentence, which the offender must serve before becoming eligible for consideration for rehabilitative programs, must be designated." Palmer, 902 S.W.2d at 394. Typically, a percentage not greater than seventy-five percent of the sentence should be fixed for a misdemeanor offender. Id. at 393-94; Tenn. Code Ann. § 40-35-302(d).

An individual convicted of a misdemeanor has no presumption of entitlement to a minimum sentence. Johnson, 15 S.W.3d at 518 (citing State v. Baker, 966 S.W.2d 429, 434 (Tenn. Crim. App. 1997); State v. Creasy, 885 S.W.2d 829, 832 (Tenn. Crim. App. 1994)). The misdemeanor sentencing statute requires that the trial court consider the purposes and principles of sentencing when calculating the percentage of the sentence to be served in confinement prior to "consideration for work release, furlough, trusty status and related rehabilitative programs." Tenn. Code Ann. § 40-35-302(b), (d). Moreover, a trial court has the authority to place a defendant on probation immediately or after service of a portion of the sentence in periodic or continuous confinement. Tenn. Code Ann. § 40-35-302(e).

Furthermore, a defendant bears the burden of proving suitability for probation, including showing that probation will serve the ends of justice and the best interests of the public and the defendant. Carter, 254 S.W.3d at 347. In determining whether to grant probation, a trial court should consider whether: 1) "confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;" 2) "confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses;" and 3) "measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant." Tenn. Code Ann. § 40-35-103(1)(A)-(C).

Here, the trial court discussed the Defendant's suitability for an alternative sentence in general, finding two considerations relevant. The trial court found relevant: "[The] non-legislative reason that the [c]ourts have promulgated for evaluation of someone's potential for rehabilitation, and that's the defendant['s] truthfulness while testifying at a trial or sentencing hearing can be considered probative on the issue [of] the defendant's potential for rehabilitation." See also State v. Justin Daniel Adams, No. M2016-00835-CCA-R3-CD, 2017 WL 929414, at *6 (Tenn. Crim. App. Mar. 8, 2017) (citations omitted); Nixon, 2006 WL 2738132, at *5. The trial court continued,

> Untruthfulness or lack of candor can be the basis for denial of [an] alternative sentence.[] And quite frankly, I . . . believe that he committed perjury here on this witness stand in multiple ways. In particular, his explanation with regard to his bill of lading was incredulous. . . . I think throughout the trial he perjured himself.

The trial court also thought that the Defendant's testimony that "he got in the front seat and didn't get out [and] didn't see who was loading the stuff in there" was unbelievable.

The trial court noted that it that was "most concern[ed]" with the consideration outlined in Tennessee Code Annotated section 40-35-103(1)(B): "Confinement is

necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses[.]" Addressing this concern, the trial court found that the Defendant committed the charged offenses of possession of 136,050 grams or more of marijuana with the intent to sell or deliver, Class A felonies, by a preponderance of the evidence despite the jury's verdict of the lesser-included offenses. The trial court noted that, had the Defendant been convicted of a Class A felony, he would not have even been eligible for alternative sentencing. The trial court further reasoned,

> I believe he perjured himself [to avoid a Class A felony drug conviction], and for me to do anything but the maximum punishment on this fellow is encouraging other drug runners to continue their business of running over 300 pounds, and then claim that they didn't know the drugs were in there.
>
> . . . .
>
> . . . But I'm not sending the message to drug dealers that you can perjure yourself and then be treated like anybody else[.]"

The trial court considered these factors before setting the length of the sentence at eleven months and twenty-nine days with minimum service percentage of seventy-five percent.[3]

The trial court held a separate sentencing hearing prior to imposing the Defendant's sentence; a hearing at which the Defendant testified and the trial court received the presentence report and the Defendant's certificate for eligibility for judicial diversion. In addition, the trial court provided findings as to why it ordered the Defendant to serve seventy-five percent of his sentence. The court determined that the Defendant lacked truthfulness, that confinement was necessary to avoid depreciating the seriousness of the offense, and that incarceration provided an effective deterrent. These findings are supported by the record.

The Defendant also avers that "the trial court failed to explain how its strong beliefs and opinions of [the] Defendant, coincided with its conclusions reached as [thirteenth] juror" that the evidence was sufficient to support the two possession offenses. The trial court concluded that the Defendant was guilty of the greater offense of possession with the intent to sell or deliver, which would necessarily include the lesser-included offense of simple possession. There is no inconsistency between the trial court's sentencing findings and its approval of the jury's verdict as thirteenth juror.

---

[3] We note that the release eligibility is not notated on the judgment form, but the trial court specifically stated seventy-five percent in its ruling from the bench. We remand for entry of corrected judgment forms to reflect that the Defendant's "minimum service prior to eligibility for work release, furlough, trusty status and rehabilitative programs" is seventy-five percent.

Because the trial court sentenced the Defendant within the appropriate range for his convictions and because the sentences reflected the court's proper application of the purposes and principles of the sentencing act, we conclude that the trial court did not abuse its discretion in denying an alternative sentence, including probation. See Bise, 380 S.W.3d at 707.

## C. *Judicial Diversion*

The Defendant also contends that the trial court erred by denying his request for judicial diversion. There is no dispute that the Defendant was eligible for judicial diversion. See Tenn. Code Ann. § 40-35-313(a)(1)(B). However, simply because a defendant meets the eligibility requirements does not automatically entitle him or her to judicial diversion. State v. Bonestal, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993). "Traditionally, the grant or denial of judicial diversion has been left to the sound discretion of the trial court." King, 432 S.W.3d at 323. When deciding whether judicial diversion is appropriate, a sentencing court must consider seven common-law factors in making its determination. Those factors are:

> (a) the accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the accused's physical and mental health, and (f) the deterrence value to the accused as well as to others. The trial court should also consider whether judicial diversion will serve the ends of justice—the interests of the public as well as the accused.

State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998) (citing State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996)); see also King, 432 S.W.3d at 326 (reaffirming that the Electroplating requirements "are essential considerations for judicial diversion"). The trial court must weigh the factors against each other and explain its ruling on the record. King, 432 S.W.3d at 326 (citing Electroplating, 990 S.W.2d at 229). If the trial court adhered to these requirements, "the determination should be given a presumption of reasonableness on appeal and reviewed for an abuse of discretion." Id. at 319. This court will "not revisit the issue if the record contain[ed] any substantial evidence supporting the trial court's decision." Electroplating, 990 S.W.2d at 229; see also Parker, 932 S.W.2d at 958.

A trial court is "not required to recite all of the Parker and Electroplating factors when justifying its decision on the record in order to obtain the presumption of reasonableness." King, 432 S.W.3d at 327. However, "the record should reflect that the trial court considered the Parker and Electroplating factors in rendering its decision and that it identified the specific factors applicable to the case before it." Id. If the trial court "fails to consider and weigh the applicable common law factors, the presumption of

-21-

reasonableness does not apply and the abuse of discretion standard . . . is not appropriate." Id. "In those instances, the appellate courts may either conduct a de novo review or . . . remand the issue for reconsideration." Id. at 328.

Here, the State concedes that the trial court denied alternative sentencing broadly and did not specifically address the Parker and Electroplating factors. However, the State asks us to employ de novo review and deny the Defendant diversion. We believe this is an appropriate case for de novo review. See State v. Jayme Lynn Shaffer, No. E2017-02432-CCA-R3-CD, 2019 WL 328482, at *5 (Tenn. Crim. App. Jan. 24, 2019) (deeming record sufficient for de novo review in judicial diversion case where trial court did not expressly address all relevant factors); State v. Leroy Collins, No. W2016-01685-CCA-R3-CD, 2018 WL 1640407, at *4 (Tenn. Crim. App. Apr. 5, 2018) (conducting de novo review of diversion decision when trial court's "brief analysis" negated the standard of abuse of discretion with a presumption of reasonableness).

The Defendant was fifty-two years old at the time of sentencing and had no criminal record. He had graduated high school and had maintained long-term employment as a truck driver. He had lived in the Memphis area throughout his life, and his two adult children lived nearby. The Defendant's physical and mental health was reported as good. Relying on this information, the risk and needs assessment determined that the Defendant's risk of re-offending was low. Accordingly, these factors weigh in favor of granting the Defendant diversion. However, we conclude that the remaining factors outweigh these and support the trial court's decision to deny diversion.

We conclude that the Defendant's amenability to correction weighs against granting him judicial diversion. The trial court found that the Defendant lacked credibility. As noted above, the trial court was concerned with the Defendant's untruthful trial testimony, finding that the Defendant "perjured himself to avoid a Class A felony drug conviction." A defendant's lack of candor reflects poorly upon their amenability to correction in the diversion context. See State v. Nunley, 22 S.W.3d 282, 289 (Tenn. Crim. App. 1999); State v. Dowdy, 994 S.W.2d 301, 306 (Tenn. Crim. App. 1994).

Here, the circumstances of the offense also weigh against diversion. The fact that the Defendant was found in possession of 324.49 pounds of marijuana in 329 one-pound, vacuum-sealed bags is not indicative of simple possession. The Defendant was hauling these drugs in a tractor trailer through multiple states into the Memphis area. The Defendant's paperwork was not in proper order according to Sergeant Harris. In addition, the seal was not properly latched on the truck's doors but simply hanging there. The trial court aptly referred to the Defendant as a "drug runner."

Also, the interests of the public weigh negatively against the Defendant because he could have been convicted of the more serious offense. See, e.g., State v. Cory Willis, No. W2008-02720-CCA-R3-CD, 2010 WL 3583961, at *5 (Tenn. Crim. App. Sept. 15, 2010) (noting as a proper consideration when taking into account the public's interests). The trial court was greatly concerned with this fact. The trial court found that the Defendant committed the charged offenses of possession of 136,050 grams or more of marijuana with the intent to sell or deliver, Class A felonies, by a preponderance of the evidence despite the jury's verdict of the lesser-included offenses. There was ample proof for the trial court to consider the Defendant's behavior leading to the original charges, even though the trial court determined that they were not established beyond a reasonable doubt. "[F]acts relevant to sentencing need be established only 'by a preponderance of the evidence and not beyond a reasonable doubt.'" State v. Cooper, 336 S.W.3d 522, 524 (Tenn. 2011) (quoting State v. Winfield, 23 S.W.3d 279, 283 (Tenn. 2000)).

Additionally, the trial court was also greatly concerned with the general deterrent effect of the sentencing decision. The trial court refused to impose an alternative sentence, stating that it would not send the "message to drug dealers" that they could commit perjury by denying knowledge of drugs and "be treated like anybody else[.]"

The Defendant's amenability to correction, the deterrent effect, the circumstances of the offense, and the interests of the public weigh heavily against the grant of judicial diversion. See Shaffer, No. E2017-02432-CCA-R3-CD, 2019 WL 328482, at *6 (affirming denial of judicial diversion where, even though remaining factors were satisfactory, defendant's amenability to correction, deterrence value to defendant, and circumstances of offense "weighed heavily" against grant of judicial diversion) (quoting State v. Parsons, 437 S.W.3d 457, 496 (Tenn. Crim. App. 2011))). As such, based upon our de novo review, we affirm the denial of the Defendant's request for judicial diversion. The Defendant is not entitled to relief.

CONCLUSION

Based upon the foregoing, the judgments of the trial court are affirmed. Consistent with this opinion, the case is remanded for the entry of corrected judgment forms to set the percentage of minimum service at seventy-five percent.

_____
D. KELLY THOMAS, JR., JUDGE

-23-